**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DAVID LANE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 05 C 6102 |
| | ) |
| ALAN UCHTMAN, Warden, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Respondent. | ) |

**MEMORANDUM OPINION AND ORDER**

In 2001, Petitioner David Lane was convicted of first degree murder and aggravated discharge of a firearm in the Circuit Court of Cook County, Illinois and sentenced to concurrent terms of 35 years and 15 years imprisonment. Lane has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, Lane's petition for habeas corpus relief [1] is denied.

**BACKGROUND**

**A.    Factual Background**

Petitioner presents no evidence challenging the statement of facts set forth in the Illinois Appellate Court's decision on direct appeal. The court therefore presumes those facts are correct for the purpose of its habeas review. 28 U.S.C. § 2254(e)(1); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007). The court adopts the following account of the facts from the Illinois Appellate Court's Rule 23 order on direct appeal in *People v. Lane*, No. 1-02-0332 (1st Dist. Ill. App. 2004)(Order, Ex. D to Resp.'s Ans.):

In November 2001, Petitioner was convicted by a jury of first-degree murder and aggravated discharge of a firearm in connection with the shooting death of 14-year-old Deon Alexander. (*Id.* at 2.) On the evening of November 12, 1998, Alexander and three of his friends were standing near the corner of Peoria Street and 58th Street in Chicago, Illinois. An argument broke out between another group of boys and a group of men in a station wagon mid-way down the block. Shots were

fired, and one of the stray bullets hit and killed Alexander as he attempted to run from the area. Petitioner and his codefendants—Marlon Barber, Michael Barber, TaJaun Jefferson, and William Smith—were later arrested in connection with the shooting and each charged with three counts of first-degree murder and three counts of aggravated discharge of a firearm.[1] Petitioner was 18 years old at the time of these events.

## 1. Suppression Hearing

Prior to his trial, Petitioner filed a motion to suppress statements he made to police soon after he was arrested on November 15, 1998. (*Id.*) Petitioner argued his statements were involuntary, and alleged that he had not been allowed to speak with his mother during questioning, despite his repeated requests to do so. At a hearing on the motion to suppress, Detective Steven Conow of the Chicago Police Department testified that he and his partner, Detective Wayne Bunch, were investigating the shooting when they interviewed Petitioner at the police station at approximately 7:30 p.m. on November 15, 1998. (*Id.*) Conow said he and Bunch advised Petitioner of his rights and Petitioner agreed to speak with them. (*Id.* at 3.) According to Conow, Petitioner related the events of the murder and identified one of his codefendants. (*Id.*) Conow then called Assistant State's Attorney Cathleen Dillon, who later arrived at the station and again advised Petitioner of his rights. (*Id.*) Dillon interviewed Petitioner with Conow present. Based on that interview, Conow testified, Dillon prepared a handwritten statement. (*Id.*) According to Conow, Petitioner read aloud the first two paragraphs of the statement, containing the *Miranda* warnings, and Dillon read the rest of the statement aloud to Petitioner. (*Id.*) Petitioner made corrections to the statement and signed each page. Conow further testified that neither Conow, Bunch, nor Dillon

---

[1] According to the Illinois Appellate Court's order, Marlon Barber and William Smith were "tried simultaneously in severed trials and convicted on similar charges." Petitioner and Michael Barber were also tried simultaneously; whether Michael Barber was convicted is not clear from the record. TaJuan Jefferson was "apparently prosecuted separately in a Juvenile Court proceeding." *People v. Lane*, No. 1-02-0332, FN 1 (1st Dist. Ill. App. Ct. 2004)

made any promises to Petitioner, and that Petitioner never requested to talk with his mother. (*Id.*)

At the hearing, Petitioner testified that he was 18 years old and living with his mother at the time of his arrest. (*Id.*) Petitioner testified that Conow and another detective came to his mother's home on the evening of November 15, handcuffed him, and brought him to the police station, where he was placed in a small room and handcuffed to a wall. (*Id.*) As soon as Conow entered the room, Petitioner testified, Petitioner asked to speak with his mother, but Conow refused his request and immediately began asking questions about the shooting. (*Id.*) After initially denying his involvement, Petitioner testified, he eventually signed a statement because he was told that he would be allowed to go home if he did so. (*Id.*) Petitioner testified that he had not read the statement nor had it been read to him before he signed it. (*Id.*) Petitioner also testified at the hearing that he did not know anything about the shooting and did not know the codefendants. (*Id.*) On cross examination, Petitioner testified that he could not read very well but admitted that he had understood the summary of his rights contained in the first two paragraphs of the statement he signed. (*Id.*) Petitioner testified that he had also understood that the other pages he signed were statements regarding the shooting of Deon Alexander, though he said he could not recall making any of the corrections that appear on the statements. (*Id.*) When asked whether his initials appeared beside the corrected portions of the statement, Petitioner refused to answer. (*Id.*)

Mardell Lane, Petitioner's mother, testified at the hearing that she was not at home when police officers came to bring Petitioner to the police station but that she learned of his arrest from a family member later that night. (*Id.*) When Mardell Lane arrived at the station, she testified, Detective Conow confirmed that Petitioner was in custody but told her that she could not see her son until after the police were finished questioning him. (*Id.* at 5.) Mardell Lane further testified that she waited at the station until after midnight before she finally went home without seeing Petitioner. (*Id.*)

Ruling from the bench, Trial Judge Stuart Palmer determined that the testimony of Petitioner

and his mother was not believable and that Conow's testimony in support of the statement's validity was not impeached. (*Id.*) The court therefore denied Petitioner's motion to suppress the statement, and Petitioner's statement was published to the jury at trial.

### 2. Trial Evidence

At Petitioner's trial, Steven Small, a friend of the victim, testified that he, Alexander, Daniel Hudson, and another boy were standing on the corner of 58th Street and Peoria Street, when a group of older boys standing a half-block up the street got into an argument with a group of men in a cream-colored station wagon. (*Id.*) The group in the station wagon soon drove north on Peoria, but returned a few minutes later. (*Id.*) Small also saw a young man walking south on Peoria toward 58th Street. Small heard gunshots and fled toward an alley. (*Id.*) Alexander also attempted to flee, but he was shot and killed. (*Id.*) (Whether Small actually saw the shots fired or saw Alexander fall is not clear from the record.) Small was later interviewed by police and viewed a lineup, where he identified William Smith as one of the men from the station wagon. (*Id.* at 5-6.) On cross-examination, Small testified that it had been dark that evening and that he did not recall seeing Petitioner in the area. (*Id.* at 6.)

Daniel Hudson testified that he too was with Alexander on the night of the shooting and that a station wagon stopped near where the boys were standing. (*Id.*) The driver of the vehicle asked Hudson if anyone had been throwing bottles. (*Id.*) Before Hudson could answer, the driver drove the vehicle toward the group of older boys down the block and stopped in the middle of the street. (*Id.*) The men in the station wagon stepped out of the vehicle and began arguing with the group of older boys. (*Id.*) The men then got back in the station wagon and drove away, telling the group of older boys that they would be back. (*Id.*) A few minutes later, the station wagon did return and drove slowly past Hudson and his friends. (*Id.*) Hudson soon heard gunshots and, as he ran toward a friend's house, saw the station wagon drive north at a high rate of speed. (*Id.*) According to Hudson, none of the older boys who had been standing down the block from Hudson's group had

been holding guns. (*Id.*) Hudson was interviewed by police and later identified Marlon Barber in a lineup as one of the men he had seen in the station wagon. (*Id.*) Like Small, Hudson acknowledged on cross examination that he could not recall having seen Petitioner on the night of the shooting. (*Id.*)

Chicago Police Officer Mike Mayhew testified that he and his partner, Officer Steve Malopy, were called to the corner of 58th Street and Peoria soon after the shooting. (*Id.* at 7.) When they arrived, Mayhew observed Deon Alexander lying on the sidewalk and radioed for an ambulance. (*Id.*) Mayhew secured the area and observed several shell casings on the sidewalk and bullet holes in some of the cars parked on the street. (*Id.*) The officers spoke with witnesses in the area and obtained a description of the vehicle involved in the shooting. At some point (precisely how long after obtaining the description is unclear), the officers located the vehicle, a cream-colored station wagon, on the 5500 block of South Union Street. (*Id.*) Mayhew and Malopy then questioned two men, later identified as Smith and Marlon Barber, who were standing near the station wagon when the officers arrived. Mayhew testified that the officers transported Smith and Marlon Barber to the police station for further questioning. (*Id.*) The parties stipulated at trial that the station wagon was registered to Ricky J. Harris, an alias used by Smith. (*Id.*)

The prosecution also called Daniel Grzemski, a forensic investigator for the Chicago Police Department, as a witness. Grzemski testified that he recovered 16 cartridge casings, two bullets, and one bullet fragment from the scene of the shooting. (*Id.*) Beth Patty, a forensic scientist for the Illinois State Police crime lab, testified as well. Although Ms. Patty could not say when the bullets and casings had been fired, she confirmed that 11 casings and two bullets were fired from a nine-millimeter handgun and that the remaining five casings had been fired from a .45 caliber handgun. (*Id.*)

Detective Conow testified at trial that he was assigned to investigate Alexander's killing on November 12, 1998. When Conow arrived at the station the following day, Smith and Marlon

Barber were already in custody. (*Id*. at 8.) Based on statements Smith and Marlon Barber made to detectives, Conow searched for and apprehended TaJuan Jefferson. (*Id*.) Jefferson, Marlon Barber, and Smith participated in a lineup in which Small identified Smith as one of the passengers in the station wagon. (*Id*.) After further interviews with the three men in custody, Conow and other detectives searched for Michael Barber and Petitioner. (*Id*.) Later that evening, Assistant State's Attorney Ron DeWald arrived at the station and spoke with Smith, who gave a handwritten statement in DeWald's and Conow's presence. (*Id*.) Marlon Barber also gave a handwritten statement. (*Id*.) The next day, based on information from Smith's and Marlon Barber's written statements and interviews with Jefferson, Conow went to Petitioner's home and brought him to the police station. (*Id*.) (It is not clear from the appellate court's order whether Conow had a warrant, whether he arrested Petitioner at his home, or whether Petitioner came to the station voluntarily.) Conow also went to Michael Barber's home and transported him to the station as well. (*Id*.)

After interviewing Petitioner at the police station, Conow contacted Assistant State's Attorney Dillon. Dillon arrived at the station and spoke first with Michael Barber, who gave a handwritten statement admitting to his role in Alexander's shooting. (*Id*.) Petitioner subsequently also signed a statement implicating himself in the shooting, in the presence of both Dillon and Conow. (*Id*.)

Petitioner's statement sets forth the following account: On November 12, 1998, Marlon and Michael Barber, TaJuan Jefferson, William Smith, and Petitioner gathered at Marlon Barber's house. The men briefly split up, Petitioner walking alone to his own house while the other four men took Smith's station wagon to a neighborhood liquor store. (*Id*. at 10.) When the other four men later arrived at Petitioner's home, Marlon Barber told Petitioner that someone had thrown a rock at the station wagon and that the group was planning to fight with the boys believed to have thrown the rock. (*Id*.) After hearing this, Petitioner retrieved a gun he had hidden in a boat across the street from his home and rejoined the others. (*Id*.) Marlon Barber was evidently aware that

Petitioner had access to a weapon: he suggested that Petitioner retrieve the gun, but Petitioner was already armed, as was Michael Barber. (*Id.*) Marlon Barber instructed Petitioner and Michael Barber to stand on opposite sides of Peoria Street while the group approached 58th Street. (*Id.*) Petitioner, Marlon Barber, and Michael Barber walked south on Peoria toward 58th Street, while Smith and Jefferson drove the station wagon and parked on the east side of Peoria. (*Id.*) Marlon Barber yelled at the group of older boys on the street that he wanted to fight. (*Id.*) Smith and Jefferson got out of the car and approached the group. (*Id.*) Petitioner then heard gun shots and saw Michael Barber firing repeatedly toward the boys on the street. (*Id.*) Petitioner ducked between two parked cars and fired twice in the direction of the boys. (*Id.*) Petitioner and the other four men regrouped later that night at Petitioner's house. At some point in the commotion of the shooting or fleeing the scene, Petitioner either dropped or threw away his gun and, he told police, he no longer knew where the weapon was.[2] (*Id.*)

At trial, ASA Dillon testified that she spoke with Petitioner during the early morning of November 17, 1998 and prepared the handwritten statement based on her conversations with him. (*Id.* at 9.) Dillon testified that after she wrote the statement, Petitioner read the first two paragraphs aloud, and Dillon read the rest aloud to him. (*Id.*) Petitioner reviewed and made corrections to the text, placing his initials beside his changes and signing the bottom of each page. (*Id.*) In the first two paragraphs of the statement, Petitioner acknowledged that he understood his *Miranda* rights, that he had not been coerced or promised anything in return for his statement, that he could read and write English, and that he had read the statement and made corrections. (*Id.*) Before the jury, Detective Conow identified and authenticated Petitioner's written statement and his signature at the bottom of each of the statement's five pages. Each page of the statement bore the signatures of Petitioner, Dillon, and Conow. (*Id.*)

---

[2]     Conow testified that he and other detectives had searched for Petitioner's gun, but investigators never recovered the weapon.

The only defense witness at trial was Jack Lane, Petitioner's uncle, who testified that, at approximately 6 or 6:30 p.m. on November 15, 1998, detectives arrived at Petitioner's mother's home, identified themselves as Chicago Police officers, and asked to speak to Byron Lane. (*Id.* at 11.) Jack Lane, who believed Byron to be Petitioner's middle name, informed the detectives that Petitioner was upstairs. (*Id.*) The detectives proceeded upstairs, handcuffed Petitioner, patted him down, and searched the immediate area where Petitioner had been sitting. (*Id.*) As the detectives were leaving with Petitioner in custody, Jack Lane testified, one of the detectives handed Jack Lane a business card containing a phone number for the police station. (*Id.*) The defense then rested.

In closing argument, the prosecutor explained to the jury that the state was not required to prove that the bullet that actually killed Alexander came from Petitioner's gun. (*Id.*) Instead, the prosecutor told the jury, Petitioner could be convicted of murder based on an accountability theory, "i.e., that he knowingly intended to promote or facilitate the commission of acts leading to the shooting death of Deon Alexander." (*Id.*) The prosecutor also argued that a conviction on the charge of aggravated discharge of a firearm would support a conviction for first degree murder, in that Petitioner's and his codefendants' intent to fire weapons in the direction of others was sufficient to convict defendant of first degree murder for the resulting death of Alexander. (*Id.*)

The trial court instructed the jury as to accountability in accordance with Illinois Pattern Jury Instruction No. 5.03, stating:

> A person is legally responsible for the conduct of another person when either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense . . . .

(*Id.* at 12., *citing* IPI Criminal 3d No. 5.03.) The court also instructed the jury that it "could convict Petitioner of first degree murder [under the Illinois felony murder rule] if it believed beyond a reasonable doubt that [Petitioner] and his codefendants combined to commit the felony of aggravated discharge of a firearm and that Alexander was killed by one of the parties committing

that unlawful act." (*Id.*)

During deliberations, the jury requested transcripts of the testimony of Daniel Hudson, Steven Small, and Cathleen Dillon. (*Id.*) The trial judge noted that transcripts of Hudson's and Small's testimony were available, but the transcript of Dillon's testimony had not yet been prepared. (*Id.*) The trial judge gave the parties the option of making the prepared transcripts available to the jury immediately or waiting until all three transcripts were prepared before submitting them to the jury. (*Id.* at 12-13.) Defense counsel preferred to submit the prepared transcripts, but the prosecutor disagreed. (*Id.* at 13.) The judge requested a relief court reporter to expedite the preparation of the transcript of Dillon's testimony but, over defense counsel's objection, directed that all three transcripts would be submitted to the jury simultaneously. The court then sent a response to the jury, explaining that all three transcripts would be furnished as soon as they were ready, but the jury reached its verdict before the court provided the completed transcripts. (*Id.*)

The jury found Petitioner guilty on one count of aggravated discharge of a firearm and three counts of first degree murder, but the trial court entered judgment on only one count of intentional murder and one count of aggravated discharge of a firearm. (*Id.*) The trial court sentenced Petitioner to concurrent terms of 35 years and 15 years imprisonment on the two counts. (*Id.*) Petitioner is currently serving his sentence in the Menard Correctional Center, under the custody of Acting Warden Don Hulick, in Menard, Illinois.[3]

**B.     Procedural History**

Following his trial, Petitioner appealed to the Illinois Appellate Court, arguing for the reversal of his convictions and sentences on the following grounds: (1) the state unlawfully amended the indictment when it affixed the accountability doctrine, and tendered it to the jury by way of

---

[3]     Named-Respondent Alan Uchtman, who was the state officer having custody of Petitioner at the time of filing, is no longer warden of the Menard facility, having been replaced by Acting Warden Hulick.

instruction, broadening the original indictment to include an offense that was never presented to the grand jury; (2) the trial court erred by allowing the state to make arguments based on the felony murder doctrine and by instructing the jury on felony murder liability; (3) the state failed to prove the *corpus delicti* of the charged crimes because Petitioner's confession was not corroborated by other evidence; (4) the evidence failed to prove beyond a reasonable doubt that Petitioner was accountable for the acts of another; (5) Petitioner's confession was inadmissable as the fruit of an illegal arrest; and (6) the trial court erred by refusing the jury's request for transcripts with a false response and engaged in *ex parte* communication with the jury by tendering a response that was not made known to the defense. (Initial Brief, Ex. A to Resp.'s Ans.)

On February 20, 2004, the Illinois Appellate Court affirmed Petitioner's convictions and sentences in an unpublished order issued pursuant to Illinois Supreme Court Rule 23. (Order, Ex. D to Resp.'s Ans.) Petitioner filed a petition for leave to appeal with the Illinois Supreme Court, raising the same six issues he raised before the Illinois Appellate Court. (PLA, Ex. E to Resp.'s Ans.) The Illinois Supreme Court denied leave to appeal on October 6, 2004. (*Id.*) Petitioner did not file a post-conviction petition pursuant to Illinois statute, 725 ILCS 5/122-1 *et seq.*, nor did he initiate any other state collateral attack on his convictions. (Petition, D.E. 11, at 6.)

Petitioner filed this *pro se* petition for a writ of habeas corpus on March 16, 2006. In his petition, Lane includes five claims—claims one, three, four, five, and six—that he previously raised before the Illinois Appellate Court on direct appeal. (*Id.* at 9-11.) Petitioner amends his argument on claim two, regarding the trial court's felony murder instruction; in his petition to this court, he argues that the trial court violated his double jeopardy rights by charging and sentencing him for both felony murder, based on aggravated discharge of a firearm, and for the underlying felony of aggravated discharge of a firearm. (*Id.* at 10.)

Respondent argues Lane's petition should be denied in its entirety. First, Respondent contends that Petitioner's double jeopardy claim is procedurally improper because it was not

previously raised before the Illinois state courts. (Resp. Ans. at 7.) Next, Respondent argues that Petitioner's claim five, regarding the legality of Petitioner's arrest, was defaulted by Petitioner before the state courts and that his conviction was therefore affirmed by the Illinois Appellate Court on independent state law grounds. (*Id.* at 8-15.) Respondent contends Petitioner's four remaining claims are either not cognizable or fail on the merits. (*Id.* at 17-25.)

## DISCUSSION

### A. Standard of Review for Habeas Relief

Under 28 U.S.C. §2254, as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), a habeas petition cannot be granted unless the decision of the state court was "contrary to or involved an unreasonable application of clearly established Federal law" or was "based on an unreasonable determination of the facts." 28 U.S.C. §2254(d)(1-2)(2000). Factual determinations made by the state court are presumed correct unless the petitioner rebuts the presumption by clear and convincing evidence. *Daniels*, 476 F.3d at 434.

A state court's decision is "contrary to" clearly established federal law only if it is inconsistent with directly controlling Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is an "unreasonable application" of clearly established federal law when the state court clearly identifies the correct legal rule but unreasonably applies the controlling law to the facts of the case. *Id.* at 407. An unreasonable application occurs only when a state decision is "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

### B. The Exhaustion Doctrine and Procedural Default

A habeas petition shall not be granted unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement "serves an interest in federal-state comity by giving state courts the first opportunity to address and correct potential violations of a prisoner's federal rights." *Perruquet v. Briley*, 390 F.3d 505, 513

(7th Cir. 2004). To satisfy the exhaustion requirement, the petitioner must establish that he fully and fairly presented his claims to the state appellate courts, thus giving the state courts a meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge. *Bintz v. Bertrand*, 403 F.3d 859, 863 (7th Cir. 2005). Fair presentment requires a petitioner to present both the operative facts and the legal principles that control each of his claims in at least one complete round of state court review. *Id.* (citing *Rittenhouse v. Battles*, 263 F.3d 689, 695-96 (7th Cir. 2001)).

In this case, Petitioner pursued his direct appeal to the Illinois Supreme Court, which denied leave to appeal. Petitioner did not seek post-conviction relief or any other state collateral proceeding attacking his convictions.[4] Accordingly, the court finds Petitioner has exhausted his available state remedies.

A habeas petitioner who has exhausted his state court remedies without properly asserting a federal claim at each level of state court review has procedurally defaulted that claim. *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). Procedural default will bar federal habeas relief unless the petitioner can demonstrate both cause for and prejudice stemming from the procedural default, *Wainwright v. Sykes,* 433 U.S. 72, 86-87 (1977), or he can establish that the denial of relief will result in a miscarriage of justice, *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986). *See Lewis*, 390 F.3d at 1026.[5]

---

[4]    Under Illinois law, with rare exceptions that are not applicable here, a valid petition for post-conviction relief must be filed within six months of the date for filing a petition for *certiorari* with the United States Supreme Court on direct appeal. 725 ILCS 5/122-1. The deadline for filing a petition for *certiorari* for direct appeal is 90 days from the judgment sought to be reviewed. SUP. CT. R. 13. The deadline for Petitioner to seek post-conviction relief from the state has long since passed.

[5]    Cause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his federal claim to the state courts. *See Lewis*, 390 F.3d at 1026 (citing *Murray*, 477 U.S. at 488). Prejudice is established by showing that the violation of the petitioner's federal rights "worked to his *actual* and substantial disadvantage,

(continued...)

12

**C.    Claim I – Amending the Indictment**

Petitioner first argues that the prosecutor and trial court constructively amended the indictment and broadened the murder charge against him by allowing argument and instructing the jury based on an accountability theory.  An indictment that is constructively amended violates the Constitution because the Fifth Amendment requires an indictment of a grand jury to guarantee that the allegations in the indictment match the proof at trial.  This requirement insures that the defendant is not subject to a second prosecution and gives the defendant reasonable notice so that he may prepare a defense.  *United States. v. Trennell*, 290 F.3d 881, 888 (7th Cir. 2002).

The established federal law in this area explains that a constructive amendment to an indictment occurs when either the government through its presentation of evidence or its argument, the court through its instructions to the jury, or both, broaden the possible bases for conviction beyond those presented to the grand jury.  *United States v. Cusimano*, 148 F.3d. 824, 829 (7th Cir. 1998).  In order to constitute a constructive amendment, the crime charged in the indictment must be "materially different or substantially altered" at trial, rendering it "impossible to know whether the grand jury would have indicted for the crime actually proved."  *Trennell,* 290 F.3d at 888 (quoting *United States v. Muelbl*, 739 F.2d 1175, 1180-81 (7th Cir. 1984)).

Petitioner's constructive amendment claim lacks merit.  Under Illinois law, "[a]ccountability is not in and of itself a crime.  Rather the [accountability] statute is a mechanism through which a criminal conviction may be reached."  *People v. Hicks*, 181 Ill.2d 541, 547, 693 N.E.2d 373, 376 (1998).  In *People v. Ceja*, the Illinois Supreme Court expressly held that it was proper for a

---

[5](...continued)
infecting his entire trial with error of constitutional dimensions." *Lewis*, 390 F.3d at 1026 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  In order to show, alternatively, that a miscarriage of justice would result if federal habeas relief is foreclosed, the petitioner must show that he is actually innocent of the offense for which he was convicted, i.e., that no reasonable juror would have found him guilty of the crime but for the errors attributed to the state court. *Schlup v. Delo*, 513 U.S. 298, 327-29 (1995).

defendant, indicted as a principal for first-degree murder, to be tried and convicted under an accountability theory. 204 Ill.2d 332, 361, 789 N.E.2d 1228, 1247 (2003)("It is proper to charge a defendant as a principal even though the proof is that the defendant was only an accomplice. Courts permit this pleading practice because accountability is not a separate offense, but merely an alternative manner of proving a defendant guilty of the substantive offense.")(internal citations omitted).

In this case, Petitioner was charged with first degree murder and aggravated discharge of a firearm, and his indictment made no distinction as to whether he was to be charged as a principal or an accomplice. (Order, Ex. D to Resp.'s Ans. at 15.) As Illinois law recognizing accountability as a basis for criminal liability is well established, Petitioner cannot claim a lack of reasonable notice in preparing his defense. Lane's claim, instead, appears to rest on a misunderstanding of the law—that is, he appears to believe accountability, a theory under which he may be liable for the charged offense, is in fact an independent crime. Because accountability is not in fact an independent crime, the prosecutor's reliance on that theory does not result in a constructive amendment of the indictment. The Illinois Appellate Court, citing *Hicks*, affirmed Petitioner's conviction on this basis. That decision is neither inconsistent with clearly established federal law nor is it an unreasonable application to the facts here. Petitioner is not entitled to habeas relief on this claim.

## D.     Claim II – Double Jeopardy and Felony Murder

If a federal habeas petitioner has failed to properly present his federal claim to the state courts and has exhausted his state court remedies, his claim is procedurally defaulted. *Perruquet*, 390 F.3d at 513. Respondent contends that Petitioner's double jeopardy claim is procedurally defaulted because Petitioner did not fairly present it to the Illinois courts for review. The court agrees.

To fairly present his federal claim to the state courts, a petitioner "must, in some manner,

14

alert the state courts to the federal underpinnings of his claim." *Id.* at 519. In evaluating whether the state courts were sufficiently alerted, courts look at a number of factors, including (1) whether the petitioner relied on federal cases that engage in constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation. *Id.* (citations omitted). The court must consider the facts of each case; the presence of any single factor does not automatically avoid waiver. *Id.*

In Claim II of his habeas petition, Petitioner claims that his double jeopardy rights were violated because he was charged with felony murder based on aggravated discharge of a firearm and separately convicted and sentenced for aggravated discharge of a firearm. Before the Illinois Appellate Court, Petitioner did not raise a federal constitutional argument on this basis, but instead argued that the trial court committed error under Illinois state law. (Brief, Ex. A to Resp.'s Ans. at 13.) Because aggravated discharge of a firearm is inherent in any murder with a firearm, Lane argued, aggravated discharge could not serve as a predicate forcible felony for felony murder. (*Id.*) The Illinois Appellate Court rejected Petitioner's state law arguments, saying, "the conduct of firing weapons [by Petitioner and his codefendants] was motivated by an independent felonious purpose other than the killing of Deon Alexander." (Order, Ex. D to Resp.'s Ans. at 17, *citing People v. Toney,* 337 Ill. App. 3d. 122, 133 (2003).) The court found Petitioner had armed himself and fired his weapon intending to injure the boys with whom his friends had argued.

None of the federal or state cases relied on by Petitioner on direct appeal engage in a double jeopardy constitutional analysis. Instead, the cases he cited refer to principles of Illinois state law that limit predicate offenses for felony murder. *People v. Kidd*, 295 Ill.App.3d 160, 692

N.E.2d 455 (4th Dist. 1998)[6]; *People v. Crespo*, 203 Ill.2d 335, 788 N.E.2d 1117 (2001); *People v. Collins*, 106 Ill.2d 237, 478 N.E.2d 267 (1985); *People v. Morgan*, 307 Ill.App.3d 707, 718 N.E.2d 206 (4th Dist. 1999), *rev'd* 758 N.E.2d 404 (Ill. 2001); *People v. Furby*, 138 Ill.2d 434, 563 N.E.2d 421 (1990); *Jackson v. Virginia*, 443 U.S. 307 (1979). Other than *Jackson*, which Petitioner cited in support of his attack on the sufficiency of the evidence presented in trial, Petitioner cited only Illinois cases and state law on felony murder. Petitioner's argument on direct appeal made no reference to the double jeopardy clause, the Fifth or Fourteenth amendments, or even the Constitution generally in the context of his felony murder claim. Having failed to make even the slightest allusion to any federal right at issue, Petitioner cannot be said to have framed his prior claim to call his double jeopardy right to mind in the state court.

Nor is the pattern of facts alleged by Petitioner within the mainstream of constitutional double jeopardy litigation. The Double Jeopardy Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, provides that no person shall be "subject for the same offence to be twice put in jeopardy of life and limb." The Clause protects against the imposition of multiple criminal punishments and successive prosecutions for the same offense. *Hudson v. United States*, 522 U.S. 93, 99 (1997); *United States v. Dixon*, 509 U.S. 688, 696 (1993).

In this case, Petitioner was convicted at a single trial of separate offenses and sentenced to concurrent terms of imprisonment. This situation does not obviously implicate Petitioner's double jeopardy rights in such a way that the state courts should have been alerted to the claim. In fact, even in his petition to this court Petitioner fails to explain how, on these facts, his double jeopardy rights may have been infringed.

Three separate guarantees inhere in the Double Jeopardy Clause: (1) once acquitted of a

---

[6]     The *Kidd* case, relied on by Petitioner as imposing limitations on Illinois' felony murder doctrine, was later abrogated by the Illinois Supreme Court's decision in *People v. Morgan*, 197 Ill.2d 404, 758 N.E.2d 813 (2001).

charge, a person shall not be prosecuted again for the same crime; (2) once convicted of a charge, a person shall not be prosecuted for the same crime; and (3) one shall not be punished twice for the same offense. *United States v. Hatchett*, 245 F.3d 625, 630 (7th Cir. 2001). Only the third guarantee, if any, could potentially apply to Petitioner, as he was convicted of separate crimes in the same proceeding based on the same criminal act.[7] Petitioner's double jeopardy claim is faulty for two reasons. First, aggravated discharge of a firearm and first-degree murder do not have the same elements under Illinois law. In Illinois, a defendant is guilty of aggravated discharge when he knowingly or intentionally discharges a firearm in the direction of another person. 720 ILCS 5/24-1.2(a)(2). He is guilty of felony first-degree murder when he is "attempting or committing a forcible felony other than second degree murder" and his acts cause the death of another. 720 ILCS 5/9-1(a)(3). Where the same act constitutes a violation of two distinct statutory provisions, whether there are two offenses or only one depends on whether each provision requires proof of an additional fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The *Blockburger* test is met here. Since the two charges Petitioner was convicted of contain distinct elements, they do not implicate Petitioner's double jeopardy rights. Second, with regard to Petitioner's sentence, the Supreme Court has made it clear that the Double Jeopardy Clause proscribes multiple punishments for a single offense only when those punishments are imposed in successive proceedings. *Hudson,* 522 U.S. at 99. As Petitioner was convicted of and sentenced for offenses with distinct elements at a single proceeding, his Double Jeopardy claim would fail even if the court were to address it on the merits.

The court need not reach the merits, however. A court may only address an otherwise defaulted claim if a petitioner demonstrates cause and prejudice, or convinces the court that a

---

[7]    Petitioner is serving concurrent, rather than consecutive, sentences, so even this attempt by the court to make sense of Petitioner's arguments based on a theory of cumulative punishment overstates his case.

miscarriage of justice would result from a failure to address the claim on the merits. *See Lewis*, 390 F.3d at 1026. Petitioner does not assert any of these elements here. Petitioner has not shown cause; he does not indicate any "external impediment" that blocked him from asserting his federal claim in the state courts. *Perruquet*, 390 F.3d at 514-15. Petitioner has not shown prejudice; he has not shouldered the burden that any asserted error resulted in an "actual and substantial disadvantage" to him at trial. *United States v. Frady*, 456 U.S. 152, 170 (1982). Finally, Petitioner has not demonstrated that a miscarriage of justice has occurred; he has presented no new evidence of his actual innocence nor claimed such evidence exists.

The double jeopardy claim is dismissed as procedurally defaulted.

## E.     Claim III – Corroborating the Confession and Corpus Delicti

Petitioner next claims that the state failed to prove the *corpus delicti* of the charged crimes under the reasonable doubt standard. Petitioner's arguments, both on direct appeal and on habeas review, present essentially a question of Illinois law. Under Illinois law, a prosecutor must present evidence apart from the defendant's own statements that tends to show the commission of the offense and that corroborates the facts related in the statement. *People v. Furby,* 138 Ill.2d 434, 446, 563 N.E.2d 421, 426 (1990). "[I]f the independent evidence tends to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti.*" *People v. Willingham*, 89 Ill.2d 352, 361, 432 N.E.2d 861, 865 (1982).

Errors of state law in and of themselves are not cognizable on habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The remedial power of a federal court on habeas review is limited to violations of the petitioner's federal rights, so a federal court will intervene only if a state court's errors have deprived the petitioner of a right under federal law. *Id.*

As this circuit has observed, the *corpus delicti* rule is a "vestige of a time when brutal methods were commonly used to extract confessions, sometimes to crimes that had not been

18

committed." *United States v. Kerley*, 838 F.2d 932, 939-40 (7th Cir. 1988). "Never well adapted to its purpose of preventing the conviction of a person on the basis of an unreliable confession . . . the *corpus delicti* rule no longer exists in the federal system, where the requirement is instead that there must be substantial independent evidence which would tend to establish the trustworthiness of that statement." *Id.* (Internal citations omitted). Under the federal rule, there is no requirement that the government provide proof beyond a defendant's trustworthy confession to establish the *corpus delicti*. *Opper v. United States*, 348 U.S. 84, 93 (1954).

As the substantial difference between the federal and state rules demonstrates, Illinois's particular formulation of the *corpus delicti* rule is not, of itself, a federal constitutional requirement. Instead, the *corpus delicti* rule is an evidentiary standard that does not give rise to a cognizable habeas claim unless it implicates some other federal constitutional right. *Evans v. Luebbers,* 371 F.3d 438, 443 (8th Cir. 2004)(holding that a violation of Missouri's *corpus delicti* rule, which is nearly identical to the Illinois rule, was not cognizable on habeas review). While Petitioner has a constitutional right to be convicted only where every element of the crime has been proved beyond a reasonable doubt, the particular manner by which state law requires verification of facts set forth in a confession does not pose a cognizable claim on habeas review.

In any event, as the Illinois Appellate Court observed, Petitioner's confession was, in fact, substantially corroborated by other evidence produced at trial. The circumstances of the shooting as set forth in Petitioner's confession—an argument about an object being thrown, the use of a station wagon, the men in the vehicle leaving and soon returning with some on foot, the location of the incident, the use of two firearms in the shooting, several shots fired—were all independently corroborated by the testimony of Hudson and Small and by forensic evidence. This evidence is sufficient to satisfy both the Illinois and federal standards. It clearly establishes that the confessed-to crime occurred and that it occurred in much the same manner as Lane said it did, establishing Lane's confession as sufficiently trustworthy.

19

The underlying substantive right potentially at issue in Petitioner's claim is the Fourteenth Amendment's requirement that a defendant be convicted only where there is sufficient evidence to support a finding of guilt beyond a reasonable doubt. A conviction obtained without sufficient proof is constitutionally invalid, and a such a claim is cognizable on habeas review. *Jackson*, 443 U.S. at 319-21 (1979). A petitioner is entitled to habeas relief on this basis, however, only if no rational trier of fact could have found in the evidence proof sufficient to establish guilt beyond a reasonable doubt. *Id.* at 319. Petitioner Lane does not meet this test. He voluntarily confessed after knowingly waiving his *Miranda* rights. His account of the crime was substantially corroborated by eye witness testimony and forensic evidence. Petitioner is not entitled to habeas relief on this claim.

## F.     Claim IV – Reasonable Doubt and Accountability

Petitioner next contends that he was not proven guilty beyond a reasonable doubt because the evidence at trial failed to establish that he was accountable for the acts of his codefendants and shared the requisite criminal intent in committing the offense of aggravated discharge of a firearm, resulting in the subsequent death of Deon Alexander. In considering this argument, the Illinois Appellate Court did not specifically cite *Jackson v. Virginia*, but the court did apply the correct standard for evaluating the sufficiency of the evidence. (Order, Ex. D to Resp.'s Ans. at 18.)[8] The state court was not required to refer to the *Jackson* standard by citing the specific Supreme Court decision, *Early v. Packer*, 537 U.S. 3, 8 (2002), and the Seventh Circuit has previously upheld the very language relied on by the Illinois Appellate Court as consistent with *Jackson*. *Cabrera v.*

---

[8]     The Illinois Appellate court stated the *Jackson* standard this way: "In reviewing the sufficiency of evidence to sustain a conviction, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The Appellate Court cited the Illinois Supreme Court case, *People v. Smith*, 185 Ill.2d 532, 541, 708 N.E.2d 365, 369 (1999), which in turn cites the Supreme Court's decision in *Jackson v. Virginia.*

*Hinsley*, 324 F.3d 527, 533 (7th Cir. 2003).

As the Appellate Court applied the correct legal standard, the court need only consider whether the Illinois decision was based on an unreasonable application to the facts.  The state court's decision passes this test as well.  Petitioner's statement admitted that he obtained a firearm in anticipation of a street confrontation and that he fired the weapon twice.  That statement was corroborated by witness testimony and forensic evidence of several bullet fragments and shell casings recovered at the scene.  "Such evidence leads to the obvious inference that defendant agreed and aided . . . in the planning and commission of the crime of aggravated discharge of a firearm." (Order, Ex. D to Resp.'s Ans. at 19.)  The Appellate Court gave appropriate deference to the jury's determination and concluded that the evidence, when viewed in the light most favorable to the prosecution, supported the guilty verdict.  Given the nature of the evidence presented against Petitioner, this determination is not unreasonable.  Petitioner's request for habeas relief based on this claim is denied.

## G.     Claim V – Confession Pursuant to an Unlawful Arrest

Petitioner next contends that his conviction was unconstitutional because it was based on a confession that should have been suppressed.  Petitioner argues that police lacked probable cause for his arrest because the information leading to his arrest was not reliable.  The subsequent confession was, he contends, therefore inadmissable.  Notably, Petitioner does not now challenge the voluntariness of his statements, as he did on direct appeal.  Respondent contends that Petitioner has forfeited his unlawful arrest claim by failing to raise it before the state trial court.  The Illinois Appellate Court's rejection of the claim, Respondent urges, therefore rests on the independent state-law ground of procedural default.

Failure to raise an issue before a state court may be a bar to federal habeas relief, but only if the state court specifically relied on the failure as an independent and adequate state ground.  *Braun v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000)(citing *Coleman v. Thompson*, 501 U.S. 722, 729

(1991)). To conclude that the procedural default constitutes an independent basis for the state court's ruling, this court must be convinced that the last state court to consider the question actually relied on procedural default as the basis for its decision. *Braun*, 227 F.3d at 912. If the state court did not "clearly and expressly" state that its judgment rests on a procedural default, then procedural default will not bar consideration of a federal claim on habeas review. *Harris v. Reed*, 489 U.S. 255, 263 (1989).

The court does not find independent and adequate state law grounds for dismissal of this claim. While the state did argue on direct appeal that Petitioner had waived his unlawful arrest claim, the Illinois Appellate Court did not clearly and expressly base its decision on waiver. Instead, the Appellate Court referred to waiver only briefly before resolving the claim on its merits:

> The state responds that defendant has waived the issue of the legality of his arrest by failing to file a motion to quash a trial . . . . Generally, an appellant waives an issue for purposes of appeal where he fails to object at trial and to raise the issue in a post trial motion. Here, defendant never filed a motion to quash his arrest, and without any hearing on the matter, we are thus left with no developed facts as to the circumstances leading to defendant's arrest. *Waiver aside,* we find that defendant's arrest was lawful and that his resulting statement was admissible.

(Order, Ex. D to Resp.'s Ans. at 22.)(emphasis added). The Appellate Court then proceeded to address the claim on its merits. The Appellate Court's brief reference to procedural default does not constitute a clear and express statement sufficient to foreclose consideration of Petitioner's federal claim on habeas review.

Instead, the court reviews the state court's decision on the merits to determine whether the decision is contrary to clearly established federal law or involves an unreasonable application of law. Though the Illinois Appellate Court cited only Illinois cases, it properly applied the federal law requiring probable cause. The state court said: (1) a officer may make an arrest only when he has probable cause to believe that the arrestee has committed an offense, (2) to determine whether probable cause exists, courts examine whether a reasonable person would believe the arrestee

committed the offense, and (3) whether probable cause exists depends on a totality of circumstances. Each of these statements is consistent with federal law.

Nor did the state court unreasonably apply the law in this case. Probable cause exists when the facts and circumstances known to police officers at the time of an arrest, and of which they have reasonably trustworthy information, were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense. *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964). Whether probable cause is present in any given case depends on a totality of the circumstances, not a mechanical checklist. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). The factors to be considered "are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

As the state court observed, "[t]he presence of three separate statements by three separate individuals [TaJaun Jefferson, William Smith, and Marlon Barber] implicating defendant in the offense renders it highly probable that defendant took part in the crime." That the codefendants' statements acknowledged their own illegal activity enhanced their reliability. The Illinois Appellate Court's conclusion that the separate statements of the three codefendants, each independently implicating Petitioner in the crime, were sufficient to support probable cause for his arrest is not unreasonable. Petitioner's request for habeas relief based on this claim is denied.

## H.     Claim VI – The Court's Response to the Jury Request

Lastly, Petitioner claims that the trial court erred in responding to the jury's request to review the transcripts of testimony from Daniel Hudson, Steven Small, and Cathleen Dillon during its deliberation. Petitioner also claims the judge engaged in a prohibited *ex parte* communication in response to the jury's request. Though Petitioner does not identify the constitutional harm that he claims to have suffered, the court assumes Petitioner relies on the Sixth Amendment's Confrontation Clause and the Fourteenth Amendment's Due Process Clause.

In Illinois, as in the federal courts, the decision whether to comply with a jury's request for a transcript of witness testimony is purely within the trial court's discretion. *United States v. Howard*, 80 F.3d 1194, 1202 (7th Cir. 1996)(citing *United States v. Guy*, 924 F.2d 702, 708 (7th Cir. 1991); *People v. Williams*, 173 Ill.2d 48, 87, 670 N.E.2d 638 (1996). A trial court's action in this regard is on its face unlikely to implicate a defendant's constitutional rights. *Ex parte* communications between a judge and jury, however, do implicate a defendant's right to be present at every stage of the trial under the Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment. *United States v. Smith*, 31 F.3d 469, 471 (7th Cir. 1994). "It is well settled that once the jury has begun to deliberate, counsel must be given an opportunity to be heard before the trial judge responds to any juror inquiry." *Id.*

At the time of the jury's request to review the transcripts in Petitioner's case, Dillon's testimony had not yet been fully transcribed. After conferring with both parties, the trial court opted, over Petitioner's objection, to wait until Dillon's testimony was fully transcribed and to submit all three transcripts to the jury simultaneously. The judge requested a relief court reporter to expedite the preparation of the transcript and told the jury the transcripts would be provided when they were finished, but the jury reached its verdict before the court could furnish the transcripts. The record demonstrates that, before responding to the jury, the trial judge informed both parties of the jury's request and invited argument on how to proceed. In the presence of both parties, the judge determined that the best response would be to tell the jury that all three transcripts would be provided when they were all completed. The Illinois Appellate Court's finding that no ex parte communication occurred, and that the trial court did not abuse its discretion, is not unreasonable or contrary to any established federal law. *See Howard*, 80 F.3d at 1202. Nor has Petitioner identified any prejudice resulting from the trial judge's resolution of the issue. His request for habeas relief on this claim is denied.

## CONCLUSION

For the reasons stated above, the court denies Petitioner Lane's petition for the writ of habeas corpus [1].  The case is dismissed.

ENTER:

Dated:   December 8,2009

_____
REBECCA R. PALLMEYER
United States District Judge